## MULLER, RESPONDENT, v. BUYCK, APPELLANT.

[Argued March 29, 1892.  Decided July 11, 1892.]

EQUITY — *Resulting trust — Pleading.* — A complaint in an action for the cancellation of a deed and bill of sale, and to declare a trust, which alleges that the property in question was purchased with the money of the plaintiff, and that defendant at all times since the same was conveyed to him held the same solely as trustee for plaintiff; that such property was purchased out of the earnings and money of the plaintiff, who permitted the title to be taken in the name of the defendant, and that all the moneys which defendant had at the time of the execution of the conveyances were the moneys of the plaintiff, had and held by defendant as her agent and trustee, and out of which all the property in question was purchased and paid for, states facts sufficient to create a resulting trust.

SAME — *Same — Cancellation of deed — Fraud and duress.* — It appeared in the case at bar that the plaintiff and defendant had lived together for about nine years; that defendant had exercised an undue influence over plaintiff; that in consequence of their relations plaintiff had permitted the defendant to take the title to real estate purchased by him with her money; that plaintiff having been maltreated by the defendant, drank excessively of intoxicating liquors, and while suffering from the effects of a month's debauch, and yielding to the solicitations of defendant, through fear of harm, and that he might abandon her without restoring any of her property, executed to him a quitclaim deed and bill of sale of all her property, receiving therefor a sum of money much less than its value, and which money was in fact her own and held by him in trust; that plaintiff was ignorant and illiterate, and at the time of making the deed was without counsel, and only understood generally the nature of the transaction; that defendant was a man of considerable education, intelligence, and unscrupulous business capacity. *Held,* that plaintiff was entitled to a decree cancelling the quitclaim deed and bill of sale, and adjudging her the owner of the property held in defendant's name, and compelling him to account therefor as a trustee.

*Appeal from First Judicial District, Lewis and Clarke County.*

Action to cancel a deed and declare a trust. Decree was given for plaintiff by HUNT, J. Affirmed.

Statement of facts, prepared by the judge delivering the opinion.

The appeal is from the judgment entered by the trial court, and the assignments of error are predicated on the pleadings and the findings which constitute part of the judgment roll.

By this action plaintiff seeks to compel the transfer of the legal title and possession of several parcels of real estate described in the complaint, situate in Lewis and Clarke County, this State, together with certain furniture situate in houses standing on certain of said lots, from defendant to herself; and also an accounting, and recovery of rents and profits alleged to have been derived from said property by defendant, while he held the same as trustee for the use and benefit of plaintiff. Plaintiff alleges that she is the owner and entitled to the possession of said property, all of which is specifically described in her complaint; and that, although "the title to said property is in the name of defendant, it was purchased with the money of this plaintiff, and that defendant at all times since the same was conveyed to him held the same solely as trustee for plaintiff;" that plaintiff and defendant for a period of about nine years prior to November 21, 1889, lived together in the cities of New York, Chicago, and Helena, and during all of that time defendant was kept and supported by plaintiff, and had no means of his own, nor any source of revenue, and was engaged in no employment, except for a short period, when he kept a saloon in the city of Chicago, out of which he realized nothing; that for a number of the last of said nine years during which defendant and plaintiff lived together they were engaged to be married, and that during all of said time, except about two months immediately prior to November 21, 1889, the relations of plaintiff and defendant were intimate and confidential, and that for several years immediately before November, 1889, plaintiff confidently expected to marry defendant; that out of plaintiff's money she had purchased the property described, and permitted the title thereto to be put in the name of the defendant, who held and agreed to hold the same solely as trustee for plaintiff; that in October, 1889, plaintiff delivered to defendant eighteen hundred dollars to keep for plaintiff, and that defendant still retains the same; that in the fall of 1889 defendant assaulted and beat plaintiff, and was about to abandon her, and that plaintiff became greatly distressed by reason thereof, and the further reason that the

title to her said property stood in the name of defendant, and that by reason thereof she began to drink excessively of intoxicating liquors; that while plaintiff was intoxicated, and after repeated solicitations of defendant's attorney so to do, plaintiff being without counsel and ignorant of her legal rights, fearing that defendant would leave her without restoring her property or any of it to her, and fearing herself in danger of extreme maltreatment by defendant, plaintiff executed a quitclaim deed and bill of sale conveying to defendant all of her said real and personal property for the sum of three thousand dollars, paid her by defendant; that plaintiff is unfamiliar with the English language, and by reason thereof she did not know the nature and contents of said instruments, and that by reason of the aforesaid facts plaintiff fraudulently procured the execution thereof; that the value of said real estate at the time of executing said quitclaim deed conveying the same to defendant was fifteen thousand dollars, and that the value of the rents and profits thereof since November 21, 1889, together with the moneys of plaintiff in defendant's hands, is greatly in excess of three thousand dollars paid by defendant to plaintiff at the time of executing said conveyances; that defendant executed two certain mortgages on said real estate to secure the sums of two thousand five hundred dollars and four hundred dollars, respectively, which are now outstanding liens thereon to the amount of said sums.

Upon the allegations of her complaint, plaintiff prayed for judgment canceling said quitclaim deed and bill of sale, and that defendant be compelled to account to plaintiff for said property and the rents and profits thereof as trustee, holding the same in trust for the use and benefit of plaintiff, and that the court compel the execution of said trust by decreeing the transfer of the legal title of said property to plaintiff, and for judgment in favor of plaintiff against defendant for such sum as may be found due her on an accounting.

Defendant first demurred to the complaint on the alleged ground that the same failed to state facts sufficient to constitute a cause of action. The demurrer was overruled, and defendant thereupon answered said complaint, denying plaintiff's alleged ownership, right, title, or interest in said property, or

any part thereof; and denied that said property, or any portion thereof, was purchased with moneys belonging to plaintiff; or that defendant took and held title thereof, or to any portion thereof, in trust for plaintiff; and specifically denied all the allegations of the complaint, except that he held the legal title and possession to said property, and that he and plaintiff had lived together in intimate and confidential relations for about nine years prior to November, 1889; but he denied that he was without means of support or source of revenue during said period, and denied that he was supported during that period by plaintiff. On the contrary, he alleged that he supported plaintiff. Defendant admitted that plaintiff had accepted from him three thousand dollars, and in consideration thereof executed said quitclaim deed and bill of sale conveying said property to defendant; but he denied specifically all the facts and circumstances alleged by plaintiff relating to the alleged fraudulent procurement of the execution of said instruments. Defendant also alleged that all of said property was purchased by him with his own means, and for his own use and enjoyment; that he was the sole owner thereof; and that plaintiff has not, nor ever had, any interest, right, or title whatever therein; that during all of said period of nine years plaintiff knew that defendant was a married man, and had no cause to expect that defendant would marry her, and denied that he ever promised to marry plaintiff, or ever gave her any reason to expect that he would marry her. He denied that plaintiff ever put into his hands eighteen hundred dollars, or any sum, to keep for plaintiff; or that he had in his keeping or detains any sum of money belonging to plaintiff, or in which plaintiff has any interest. Denied that he ever maltreated or struck plaintiff, or that through any such reason or influence plaintiff began to use intoxicating liquor to excess, but admitted that plaintiff had for a long time been addicted to the use of such liquor to excess. Having alleged that he bought said property with his own funds, and for his sole use and benefit, defendant alleged that on or about the 14th of November, 1889, plaintiff set up a false and fraudulent claim to said property, asserting that she owned an interest therein, and that, "although said claim was without any merit whatever, this defendant, in order to avoid

trouble with plaintiff, and to be relieved of the annoyance of her persistent and offensive demands, offered to pay her any reasonable sum if she would cease to molest him, and would peaceably and quietly relinquish and execute to him a quit-claim deed of all said real estate, and a bill of sale of all of said personal property;" that plaintiff agreed to so relinquish her claims on said property, and cease to annoy and molest defendant, if he would pay plaintiff the sum of three thousand dollars, which sum, for the considerations aforesaid, and not because plaintiff had any just claim on or interest in said property, or any part thereof, defendant agreed to pay to plaintiff; and that he did pay her said sum on her execution and delivery of said deed and bill of sale, which defendant alleges she executed freely and voluntarily, and with full understanding of the contents, nature, and effect thereof.

Upon the trial of the cause at the close of the introduction of evidence on behalf of each party, the plaintiff, with leave of court, amended her complaint to conform to the proof, as follows :—

"That the relations of the plaintiff and defendant at all times when they lived together were intimate and confidential; that during all such time the defendant exerted an undue influence and command over plaintiff; that all moneys which he at any time had during such time, or at any time since meeting plaintiff, and the time of the execution of the instruments hereinafter referred to, were the moneys of plaintiff, had and held by him as her agent or trustee, and that out of such moneys in his hands as her agent or trustee all of the property described in the complaint was purchased and paid for; and that the title to the same was taken in the name of the defendant, by reason of the intimate and confidential relations existing between the parties hereto, and the undue influence and command by defendant exercised over plaintiff, he intending fraudulently to deprive her thereof, and of all the funds so in his hands as her agent or trustee."

Amendment was likewise made to the answer, denying the allegations of said amendment to the complaint.

The trial court made elaborate findings of fact, and stated its conclusions of law in the case, which are as follows :—

"1. That plaintiff is the owner and entitled to the possession of the property described in the complaint, to wit [here follows description of said property, which description is omitted, being immaterial to the consideration of the assignments presented on this appeal].

"2. That the legal title to all of the foregoing property stands in the name of the defendant, and that he is in the possession of the same, and collects the rents and profits thereof.

"3. That all of said property was purchased with the money of the plaintiff, which the defendant held as her agent or trustee, and that the defendant has the legal title to said property solely as trustee for the plaintiff.

"4. That the plaintiff and defendant for a period of about nine years prior to about the twenty-first day of November, 1889, lived together in New York, Chicago, and Helena, and that during all that time the said defendant was kept and supported by the plaintiff, and had no means of his own, nor any source of revenue, and was engaged in no employment, except that for a short time he kept a saloon in Chicago, out of which he realized nothing. The money invested in this saloon came from the plaintiff, and was obtained by defendant from her in the same manner as he obtained all her money hereafter set forth.

"5. Plaintiff, ever since her acquaintance with defendant, has been a prostitute. The defendant met her in a house of prostitution, and has always been, up to the time that he left her, absolutely dependent for his means of subsistence upon her earnings, and has always lived with her in illicit relations. Plaintiff, from the time of their cohabitation in 1880, was sincerely attached to defendant, and up to a short period of time after defendant returned from France she willingly trusted him, in the most confident and trustful manner, and continued to maintain him by moneys received from her prostitution, and the prostitution of women who lived with her in her several houses of ill-fame. Defendant exerted a very strong influence and power over plaintiff. She surrendered to him all moneys realized by her as the receipts of her ill-fame. He promised to marry her, and told her that when they acquired sufficient property to maintain them that she would abandon her life of prostitution. She believed what he said to her, and under such

belief, and while placing in him unlimited confidence, she trusted him.

" 6. From money obtained from plaintiff's prostitution, and a house of prostitution kept by her, certain property was purchased and paid for in New York City, the title of which was taken in defendant's name. About 1884 plaintiff and defendant went to Chicago. She bought property in Chicago with money realized from the sale of the New York property. While in Chicago, plaintiff continued her prostitution — kept a house of ill-fame, and turned over the receipts from all sources to defendant.

" 7. In Chicago defendant was started in the saloon business by money advanced him by plaintiff, but the venture proved a failure.

" 8. Plaintiff came to Helena in 1885. Defendant soon followed her. He brought with him the proceeds of the sale of the Chicago property. In Helena they lived in the same illicit way. She was a prostitute, and ran a house of prostitution. He did nothing, except the marketing and to collect the rentals of and for plaintiff's houses. She continued to turn over to him all moneys made by her, and he deposited the money in the bank in his name.

" 9. From the money brought as aforesaid by defendant from Chicago, and from that obtained by plaintiff as hereinbefore set forth, of the real estate above described, lot six (6) in block twenty-seven (27), and that portion of lot five (5) in the same block, described by metes and bounds, were purchased; and afterwards, at various intervals, from the rentals of the property previously acquired, and the receipts of the bawdy-house run by plaintiff, all of which were deposited as they accumulated in one bank account by and in the name of defendant, the remainder of the property herein and in the complaint described was purchased and paid for. The title to this property was taken in each instance in the name of the defendant. The plaintiff several times mentioned to the defendant that the title to the property being acquired should be taken in her name, but the defendant assured her that it was all right; that he would marry her, and never leave her. She acceded and trusted implicitly in him. He is a man of considerable education and intelligence,

and unscrupulous business capacity. She is ignorant and illiterate, and was at all times wholly subservient to his wishes and commands.

"10. That the relations of the plaintiff and defendant at all times when they lived together were intimate and confidential; that during all such time the defendant exercised an undue influence and command over plaintiff; that all moneys which he at any time had during such time, or at any time since meeting plaintiff, and the time of the execution of the instruments hereinafter referred to, were the moneys of plaintiff, had and held by him as her agent or trustee, and that out of such moneys in his hands as her agent or trustee, all of the property described in the complaint was purchased and paid for; and that the title to the same was taken in the name of the defendant by reason of the intimate and confidential relations existing between the parties hereto, and the undue influence and command by defendant exercised over plaintiff, he intending fraudulently to deprive her thereof, and of all the funds so in his hands as her agent or trustee.

"11. During the summer of 1889 the defendant went to France, and upon his return, about October 10, 1889, the plaintiff drew out of the bank and turned over to him, as she had always theretofore done, the proceeds of her receipts during his absence, thirteen hundred and fifty dollars.

"12. While in France defendant frequently wrote plaintiff, addressing her as Annie Sully. His letters abounded in terms of affectionate endearment. Usually they began, 'My Dear Wife.'

"13. Immediately after her turning over to him the amount of her savings during his absence he began to abuse and maltreat her, and frequently beat her so that her face was bruised and blackened. He brought with him another woman from France. The plaintiff learned of this. She began to drink, and was drunk almost continuously for some weeks previous to November 21, 1889, on which day she executed the quitclaim deed and bill of sale described in the complaint. During all this time he was uttering complaints against her, and endeavoring to get her to yield to a separation. He brought an attorney several times to see her with a view to procure her to execute

some instruments, but she refused.   He repeatedly solicited her to sign these instruments when she was drunk.   She was afraid lest defendant should do her further harm if she refused to sign, and yet she loved him and clung to him.   She feared he would abandon her without any provision.   She was still under his peculiar and strange influence, and subservient to his wishes, as she always had been.   Finally, she hoped and expected that their separation would be only temporary, and that he would return to her and marry her, as they had agreed.   She never knew he was married, if he was.   Under these circumstances, she finally went with him to the office of his attorney, signed a quitclaim deed of all the real estate, and a bill of sale of all the personal property, described in the complaint.   For this he gave her three thousand dollars.

"14.   The property conveyed it is conceded was worth at least eight thousand dollars.   The deeds had been drawn up a week before.   They were hastily read over to her.   She was not actually drunk when she executed them, but she had been on a debauch for a month before; she was nervous, frightened, and distressed, was under his influence, had no counsel, professional or otherwise, and no accurate idea of the contents of the papers.   She speaks English poorly.

"15.   The money he paid her was derived from what she gave him on his return from France, and two mortgages he executed to raise the remainder — one for two thousand five hundred dollars, and one for four hundred dollars — on the property in controversy.

"16.   The claim in the answer that he gave her three thousand dollars to avoid molestation or her persistent or offensive demands is not true.   In his letters to her from France he wrote her of 'our property,' and thus recognized her rights in the property.

"17.   From the property so on the twenty-first day of November, 1889, conveyed to him, defendant has collected rents in excess of proper offsets to the amount of three thousand dollars."

Conclusions of law : —

"1.   The defendant had no interest of any kind or character in the title to or ownership of any of the property described in plaintiff's complaint.

"2. The defendant, by fraud, misrepresentation, and artifice, secured an undue influence over plaintiff, and exerted the same to her great damage:

"3. That defendant is a trustee for plaintiff, and as such holds all the property described in the complaint in his name.

"4. That the plaintiff is entitled to a decree adjudging her to be the owner of all the property described in the complaint.

"5. That the deed and bill of sale by plaintiff to defendant, executed November 21, 1889, should be set aside as fraudulent.

"6. That plaintiff have judgment against said defendant for the amount by her turned over to defendant on his return from France, thirteen hundred and fifty dollars, and the amounts of rents by him collected, three thousand dollars, less seven hundred dollars, which it is conceded have been paid on the mortgages, and one hundred dollars, the difference in the sum raised by defendant by mortgaging the property and the sum paid by plaintiff, with interest on these sums estimated at one hundred dollars; that is, that plaintiff have judgment for three thousand five hundred dollars against defendant."

*Massena Bullard,* for Appellant.

The demurrer to the amended complaint should have been sustained. Plaintiff nowhere alleges that all of the purchase price, or even that any part of the purchase price was paid at the time of making the purchase, or prior to the time of making the purchase, or that she became in any way responsible for the payment thereof. Nor does plaintiff allege that the agreement between herself and the defendant, with reference to the trust, was in writing. We submit that the allegations of the complaint were not sufficient to set up a resulting trust. If it was sought to set up an express trust by an agreement, then the agreement should have been in writing, being within the statute of frauds. A trust results to him who pays the consideration for an estate, when the title is taken in the name of another. Such trust, however, must have arisen at the time the purchase was made, and the whole consideration must have been paid or secured at the time, or prior to the purchase. If any part of the purchase price is paid by the party who takes the title, or if he secures any part by note or mortgage, and the party seek-

ing to establish the trust does not become at the time responsible to the vendor for the payment of the balance of the purchase price, no trust arises. The money must be paid on or before the execution of the conveyance and not after, and no subsequent payment or advance can affect the question of the trust. *It is fixed and fixed definitely and absolutely at the time of the conveyance.* The complaint should state sufficient facts to show not only that the property was purchased with the money of the plaintiff, but that the money was furnished at the time of, or prior to the time of, the purchase, or that the plaintiff became herself responsible to the party from whom the property was purchased. It is not sufficient to allege that the property was purchased with the money of the plaintiff, but the complaint should show that the money was furnished at or before the time of the purchase. (*Ducie* v. *Ford,* 138 U. S. 592.) A trust results where there is no agreement, and by operation of law; but where there is an agreement the statute of frauds controls. (Comp. Stats. § 217, p. 651.) Plaintiff in this case alleges that the trust under which she claims was by agreement. If by agreement it is not by operation of law, and if not by operation of law the statute of frauds controls. Drunkenness is of itself no sufficient defense unless in such degree as to take away the ability to consent. (*Wade* v. *Colvert,* 2 Mill. Const. 27; 12 Am. Dec. 652, and note.) Plaintiff does not show that any misrepresentation was made to her with reference to the character of the instrument she was requested to sign, or that she made any inquiry as to its nature or effect, nor does she set out any facts that would excuse her or justify her in asking her that the instrument signed by her should be set aside. From all that appears in the complaint if she was ignorant of the contents of the instrument, it was because she did not make any effort to ascertain what the contents were. She was under no threats at the time, and does not allege that her intoxication was such as to take away her ability to comprehend what she was doing. She does not even set forth the fact that she was acting under any threat at the time, or that she was in danger of any violence. Duress exists where there has been violence, actual or threatened, sufficient in the eyes of the law to overcome the mind and will of a person of ordinary firmness, and

unless the complaint sets forth facts of that character it is insufficient. (Note to *Hatter* v. *Greenlee,* 26 Am. Dec. 374.) If true that the plaintiff was unfamiliar with the English language that would be no excuse for her. She had a right to demand a translation of the document or such explanation as would satisfy her. She does not allege any attempt on her part to ascertain the meaning of the paper, or any false representation as to its contents. She is therefore in no position to ask to be relieved from the effect of signing the instrument on account of either duress, misrepresentation, or fraud. The findings of fact do not sustain the conclusions of law and the decree. The court finds in the opinion that only a portion of the purchase money was furnished by the plaintiff at the time of the purchase of the several pieces of property, and that he executed his own notes and mortgages to secure the balance due on the purchase price. To the same effect are the findings of the court. The payment, in order to raise a resulting trust, must be for some specific part or distinct interest in the estate. (2 Devlin on Deeds, § 1150; *McGowan* v. *McGowan,* 14 Gray, 119; 74 Am. Dec. 668, and cases cited; *Olcott* v. *Bynum,* 17 Wall, 59; *Neill* v. *Keese,* 51 Am. Dec. 755, note; 2 Pomeroy's Equity Jurisprudence, § 1037; 1 Perry on Trusts and Trustees, § 133; 1 Leading Cases in Equity [4 Am. ed.], 337; *Botsford* v. *Burr,* 2 Johns. Ch. 408; *Ducie* v. *Ford,* 138 U. S. Rep. 587; *Baker* v. *Vining,* 30 Me. 121; 50 Am. Dec. 620; *Turner* v. *Nye,* 7 Allen, 184; *Snow* v. *Paine,* 114 Mass. 526; *Niver* v. *Crane,* 98 N. Y. 47; *Rogers* v. *Murray,* 3 Paige, 397; *Case* v. *Codding,* 38 Cal. 191; *Pinnock* v. *Clough,* 16 Vt. 508; 42 Am. Dec. 521; *White* v. *Carpenter,* 2 Paige, 238.)

*T. J. Walsh,* for Respondent.

The ruling of the court on the demurrer to the complaint is immaterial, as the defendant answered over, if the complaint as it now stands and the findings support the decree. The appellant cannot help out his case by any argument drawn from statements made by the court in the written opinion filed. Although the statute directs that a copy of the opinion, if one is filed, be transmitted on appeal, it forms no part of the judgment roll. (Code Civ. Proc. § 306; *Fant* v. *Tandy,* 7 Mont.

443.) The matter before the court is therefore resolved into the question, namely: Is it necessary that it should appear affirmatively from the complaint and findings that the entire purchase price was advanced by plaintiff prior to the time the legal title was vested in the defendant? The full force of the authorities cited is conceded. They doubtless all fully sustain the proposition that in the case of a *simple resulting trust,* the trust must arise, if at all, at the time of the purchase. "It does not arise upon payment after the execution of the deeds upon an agreement made afterwards," as it is expressed in *Gee* v. *Gee,* 2 Sneed, 395. If the case at bar presented the simple proposition of the plaintiff furnishing the money, and the title being taken in the name of the defendant, for nothing further is required to raise a resulting trust, then the authorities cited might be controlling. But the facts as they appear from the complaint, as well as from the findings, take the case entirely out of the operation of the rule appealed to, and make applicable the law expressed in Perry on Trusts and Trustees, section 166, as follows: "If a person obtains the legal title to property by such arts or circumstances of circumvention, imposition, or fraud, *or if he obtains it by virtue of a confidential relation and influence* under such circumstances that he ought not, according to the rules of equity and good conscience, to hold and enjoy the beneficial interest of the property, courts of equity, in order to administer complete justice between the parties, will raise a trust by construction out of such circumstances or relations; and this trust they will fasten upon the property in the hands of the offending party, and will convert him into a trustee of the legal title, and will order him to hold it or execute the trust in such manner as to protect the rights of the defrauded party, who is the beneficial owner." (See, also, Pomeroy on Equity Jurisprudence, § 1053.) To raise such a trust, known to the law as a constructive trust, it is entirely immaterial whether the *cestui que trust* furnishes the money before or after the title passes. Although, in the case of a simply resulting trust, the payment must be made at or before the delivery of the deed, yet where a trustee has in his hands funds of the *cestui que trust,* and applies them in acquiring property in his own name, it is immaterial whether payment is made before or after the delivery of the

deed. (*Lehman* v. *Lewis*, 62 Ala. 129; *Atkinson* v. *Ward*, 47 Ark. 533; Lawson's Rights, Remedies, and Practice, § 2016; *Turner* v. *Petigrew*, 6 Humph. 438.) It is declared in *Atkinson* v. *Ward*, *supra*, that the rule invoked by appellant has no application to a case where a relation of trust or confidence exists between the parties. And in *Robertson* v. *Robertson*, 9 Watts, 32, that fraud in the original transaction destroys its operation. The fraud so operative may be actual or constructive, such as springs from the breach of a fiduciary obligation. (Pomeroy on Equity Jurisprudence, § 1044; *Brison* v. *Brison*, 75 Cal. 529; 7 Am. St. Rep. 189.) The principles announced have been frequently applied by the courts to cases similar to the one at bar. (*Methodist Episcopal Church* v. *Jaques*, 1 Johns. Ch. 450; *Persons* v. *Persons*, 25 N. J. Eq. 250; *Cunningham* v. *Bell*, 83 N. C. 328; *Keller* v. *Keller*, 45 Md. 269; *Wood* v. *Rabe*, 96 N. Y. 422; 48 Am. Rep. 640; *Bowler* v. *Curler*, Nevada, Apr. 6, 1891, 26 Pac. Rep. 226; *Springer* v. *Young*, 14 Or. 280.)

HARWOOD, J. — Appellant does not attack any of said findings on the ground that the same are not supported by the evidence.

The first point insisted on by appellant's counsel is that the complaint does not state facts sufficient to constitute a cause of action, in that it is nowhere alleged that all the purchase price, or even that any part thereof, was paid at the time of making the purchase, or prior to that time, or that plaintiff became in any way responsible for such payment.

The allegations of the complaint are that said property "was purchased with the money of this plaintiff, and that defendant at all times since the same was conveyed to him held the same solely as trustee for plaintiff;" and again: "That, while the relations between plaintiff and defendant were as hereinbefore set forth, out of the earnings and money of this plaintiff she purchased the property hereinbefore set forth, and permitted the title to the same to be taken in the name of the said defendant;" and again it is alleged, in the amendment to the complaint allowed by the court, "that the relations of plaintiff and defendant at all times when they lived together were intimate and confidential; that during all such time defendant exerted an

undue influence and command over plaintiff; that all moneys which he at any time had during such time, or at any time since meeting plaintiff, and the time of execution of the instruments hereinafter referred to, were the moneys of plaintiff, had and held by him as her agent or trustee, and that out of such moneys in his hands, as her agent or trustee, all of the property described in the complaint was purchased and paid for."

Appellant's counsel cites and quotes some passages from the opinion of the court in *Ducie* v. *Ford,* 138 U. S. 591, in support of his contention that the complaint in the case at bar is insufficient in the respect above mentioned. It seems to us that a reading of that case will suffice to indicate the vast distinction between it and the one at bar, not only as to the facts involved, but as to the particular allegations under discussion. In the case of *Ducie* v. *Ford, supra,* the court found difficulty in ascertaining, from the allegations of the complaint, what proportion of the money necessary to make the purchase was contributed by plaintiff, and whether the various alleged contributions were made by plaintiff before or after the purchase was actually made. These inquiries were embarrassed and obscured by the peculiar allegations of the complaint in that respect, and finally, the uncertainty was deepened by the tender of an offer in the complaint to pay to defendant any residue which might be necessary to make up the one half of the funds required to purchase the property in question, which tender came long after the purchase and payment of the purchase price had been made by defendant. This was said to imply an admission that plaintiff did not know whether or not he had furnished, prior to the purchase, the consideration paid for the interest which he claimed. It seems in that case, as the court construed the complaint, it was shown that the purchase and conveyance were made (namely, the procurement of patent by defendant), and *thereafter* from time to time plaintiff furnished sums of money as his portion towards procuring one-half interest in the land. Upon this state of facts it was held that the complaint did not show facts sufficient to raise a resulting trust, because such trust must have arisen when the purchase was made, and could not have resulted in favor of plaintiff by reason of his having furnished the funds to make the purchase of the interest in question, when in fact it was not

shown that he had furnished said funds prior to or at the time of purchase and payment for the land.   That is a very different state of facts than the showing in the case at bar, where it is alleged that the entire property " was purchased with the money of this plaintiff."   There is no such ambiguity, uncertainty, or doubtful implications in the allegations of the complaint in the case at bar.   The allegation is repeatedly made in the complaint before us, without equivocation, to the effect that the entire consideration paid in the purchase of said property came out of plaintiff's funds in the hands of defendant.   It was so found by the court, and we think the allegation of the complaint in that respect is sufficient.

Under such a state of facts, where one furnishes the funds used in the  purchase, and the mere legal title is placed in the holding of another, a trust results in favor of the one whose funds purchased the property, "by operation of law;" and therefore the showing of that state of facts by parol evidence is not barred by the statutes.   (Comp. Stats. §§ 217, 215, div. 5.)

Appellant's counsel contends that the allegations set forth in the complaint as grounds for the cancellation of the instruments, whereby defendant procured from plaintiff the relinquishment and conveyance of said property to himself, are insufficient to support a decree to that end.   Counsel argues that, where drunkenness of one of the contracting parties is relied on as ground for annulling the contract, such intoxication must be of a degree sufficient to disable the mental faculties and temporarily paralyze the will power, which was not found in this case.   It is further urged by counsel for appellant that no misrepresentation was alleged or found to have been made by defendant or his attorney, or any other person, as to the nature and effect of said instruments which defendant procured from plaintiff; and that, if plaintiff was unfamiliar with the English language, she does not show that she made any effort to ascertain the nature, contents, and effect of said instruments; nor is there alleged or found any fact showing that defendant or any person misinformed plaintiff thereabout, or prevented her from obtaining full information on that subject.   These points raised by appellant's counsel must be admitted as being the state of the case, as shown by the pleadings and findings.

It is unnecessary for us to inquire what might be the conclusion reached in a given case, where the contracting parties stood on an equality towards one another and the subject-matter of the contract, and dealt with equal independence and freedom; and the only ground set up for avoiding a contract made under those circumstances was such intoxication and ignorance of the language and nature and effect of the contract, as shown by the findings in this case. It may be that in such a case, where no misrepresentation as to the nature and effect of the instrument, or other circumstances of duress or fraud, appeared, and the executing party appeared to have been negligent in seeking information or advice, if it was needed or desired, and had indulged in the use of intoxicants as found, but at the time of making the contract was not intoxicated to any great extent, or to the extent of obscuring the understanding or disarming the will of the complaining party, a court of equity would not find that the case presented grounds sufficient to annul the contract. But such a case as just described, where the contracting parties stood in an attitude of independence towards one another, with no circumstances of oppression or arbitrary dictation involved, is not a true description of the case here under consideration. In this case there are other conditions shown, beside which the intoxication, and the ignorance of the language, nature, and effect of said instruments on the part of plaintiff, become matters of minor consequence. Is it not shown that this party defendant procured those conveyances by pretending to pay plaintiff three thousand dollars of her own money — money received from her in trust, and procured from rents and the hypothecation of her real estate? Was this not an utter failure of consideration? And, further, were there circumstances of duress and oppression shown by the allegations of the complaint and findings of the court? If, when the transaction was accomplished, plaintiff had held the legal title to her property, or the disposal of it had been at her absolute and independent command without fear of defendant, and he had bought it and paid three thousand dollars of his own money therefor, it would be pertinent to inquire as to how much force should be given to the allegations and findings concerning the intoxication of plaintiff at the time of executing the conveyances, and her igno-

rance of the contents and effect thereof. What was plaintiff's position in respect to defendant and said property at the time he procured said conveyances? She did not hold the title or possession of her property. He held it in his grasp; and his answer shows that he claimed it to be entirely his own, although his claim was in fact an arbitrary, false, and fraudulent assumption, according to the findings of the court. His position, as set forth in his answer, was that plaintiff had "set up a false and fraudulent claim to said property, asserting that she had an interest therein;" that such claim was "without any merit whatever." He desired "to be relieved of the annoyance of her persistent and offensive demands." These demands, in respect to her property which he had in his possession and name, were offensive to him. He denied her claim, and, having obtained from her the possession and title of said property and nine years of support in dissolute ease and pleasure through the misplaced but generous confidence of plaintiff; and also having an alliance with another woman, and apparently no longer any reason to use his art in winning the confidence of and deluding plaintiff; and having the strength of a man, as against a woman, his real nature and designs were unmasked, and he emphasized his denial of plaintiff's rights, and his own false and fraudulent claims to her property, by brutal assault and beating of plaintiff, whose benefaction he had so largely enjoyed. There is no statement in the findings to show any provocation for such assault, unless it was plaintiff's "offensive" claims of her own property in defendant's possession. Defendant desired to be rid of plaintiff, and yet retain the greater part of her property, which her confidence and trust in him, and his influence over her mind, had caused her to put into his name and possession. He was possessed of intelligence, education, and business capacity. Her condition at the the time of said transaction is sufficiently described in the foregoing findings. In addition to her disgrace and dissipation, she was betrayed, spurned, abused, beaten, and thrust out of her property, and her rights denied even by defendant, so long the consort of her illegitimate pursuit, the sharer of its rewards, and the recipient of her confidence, favors, and support. He confronted her now as an imperious enemy, and when she ventured to assert

her rights to her property in his possession her "offensive demands" were repelled by assault from defendant. All this is shown by his answer to the complaint and the findings of the court. Under these exasperating circumstances she drank deeper of the cup of intoxication, and as stated in the findings, "was drunk almost continuously for some weeks previous to November 21, 1889, on which day she executed the quitclaim deed and bill of sale described in the complaint;" all of which, no doubt, contributed to further the fraudulent designs of defendant. The findings show that "he repeatedly solicited her to sign these instruments when she was drunk."

With these advantages defendant procured counsel to aid him, and with these circumstances of arbitrary and brutal dominance, intimidation, and oppression, without pretending to negotiate with plaintiff or consult her "free will" as to her property rights; but claiming to be absolute owner of her property, denying her rights, denouncing her claims as "false and fraudulent" and "without any merit whatever;" but, as defendant says in his answer, "in order to avoid trouble with plaintiff and be relieved of the annoyance of her persistent and offensive demands, he offered to pay her any reasonable sum if she would cease to molest him." These were the conditions under which plaintiff was led to relinquish her right to admittedly eight thousand dollars' worth of property, in order to escape utter spoliation at the hands of this defendant. These were the terms dictated by defendant as the conditions on which he proposed to sever his relations with plaintiff. It may be a matter of surprise that he was so liberal in his settlement with her, considering his conduct altogether. But probably taking into account the many other benefits he had received from plaintiff, and that the only capital he had on the commencement of his business career with plaintiff was a trunk pawned at a neighboring bawdyhouse, he arrived at the conclusion that he could consent to leave with plaintiff said portion of her property on parting company with her.

We have no hesitation in affirming the holding of the trial court that said conveyances were procured through duress and fraud, and ought to be canceled.

The opinion of the learned trial judge is in the record. He summed up the case as follows: —

"*First*, was the relationship existing between plaintiff and defendant of such a nature as to make him a trustee and her a *cestui que trust?* and, *secondly*, if such a relationship did exist, did he, as trustee, in the purchase of November, 1889, deal with her in such an open, fair, and candid manner as to permit the deeds to stand as valid and effectual? The plaintiff was a prostitute in New York when the defendant met her, about 1881. They seemed to have become attached to one another, and he lived with her in a house of prostitution for some time. They subsequently went to live on Twenty-Seventh Street, New York, where the plaintiff conducted a house of ill-fame. The defendant continued to live and cohabit with her. He says that he had about three hundred dollars during this time, but she says that he was so poor that she loaned him the money to redeem his trunk, which was in the possession of a woman who had kept a house of ill-fame where she had lived before she opened her own. I believe her, because he was perfectly idle, and because throughout her whole testimony she is corroborated upon so many material points by many of his admissions and by other and disinterested witnesses. The plaintiff's business seems to have been reasonably renumerative in New York. A house was purchased for three thousand five hundred dollars; the legal title to this property was taken in defendant's name. He admits that he had no money when it was bought, and the testimony proves that the entire sum paid for that property was derived from the plaintiff's prostitution. The defendant does not deny that the prostitution of the plaintiff and of her associates furnished all the money to pay this debt. He was in no occupation whatever, but was wholly dependent for his board and clothes and home upon the plaintiff and the receipts of her ill-fame. He seems to have acted as a *quasi* purchasing agent or assistant manager of these several houses of prostitution, but, when it is remembered that he was comfortably fed and clothed and kept in idleness, it is doubtful whether his services as a purveyor were not fully offset by his lecherous and luxurious surroundings. But, however this may have been, if he had any claim at all against plaintiff, it would be for work, labor, and

services performed, there being no rule of law by which a person acting in the capacity suggested could, by virtue of such employment alone, become seised of any title to real estate and money owned and acquired as the fruition of the lewdness of the inmates of a bawdy-house. . . . . In Helena she pursued her prostitution, and he continued to live as a dependent upon her, yet compelling her to turn over all her money to him. Several pieces of real estate were acquired; every dollar of the purchase money being furnished by her, either from the money realized by the sale of the Chicago property or by her prostitution in Helena, or by both. All the real estate and other property bought in Helena was deeded and transferred to the defendant. She must have made money in order to purchase the several houses in Helena bought from time to time and pay for them. They lived peaceably until 1889. He is a man of intelligence, far above mediocrity. His letters demonstrate that he has had the advantages of education, and the careful ways in which he sought to profit by her means testify to his unscrupulous business capacity. He used his intelligence to carry out his purpose of securing the title in his name to everything that his mistress made. He has systematically pursued a course which in the end might have, under ordinary circumstances, enabled him to become the owner of eight thousand dollars' worth of valuable property without having done one day of honest labor in ten years (aside from the saloon venture in Chicago), and without ever having had one dollar in capital of his own to invest in any legitimate enterprise whatever. The testimony shows that the woman had absolute and implicit confidence in him. . . . . In 1889 the defendant visited France. The receipts of the houses of prostitution furnished him the means for his trip. While abroad he wrote to her as 'My Dear Wife,' and his letters plainly indicate the closest and most confidential relations between himself and the plaintiff. He wrote in his letters of rents 'due us,' which would indicate his recognition of her rights in the property. After a sojourn of some months upon the seashores of France, he returned to Helena, and from that time, October, 1889, the troubles between the two began. The defendant showed to the plaintiff the picture of another woman, and the evidence tends to show that

while he was in France he had taken up with another. The plaintiff became jealous and distressed. She commenced drinking, and the proof is clear that she was drunk nearly every day for the few weeks preceding the execution of the deed. . . . . It is in evidence that he grossly maltreated the plaintiff; that he struck her in the face and bruised her; that he tried to make her yield to a separation, and that she demurred. He sent an attorney several times to see her. The objects of his visits were to procure her signature to deeds to the property. She had no lawyer, and was under the influence of liquor almost continuously. He tried himself to have her sign deeds; although drunk, she refused. . . . . She was afraid of defendant, lest he do her more physical harm, yet she loved him and clung to him. He had for nine years lived with her in a relationship which demonstrated not only her willingness to sacrifice her honor for his comfort, but she had acceded to every request or suggestion made to her by him, and yielded to every influence he had brought to bear upon her, and was as totally subservient to his wishes and disposition as ever a poor, wretched woman could be to a cunning and degraded man. Finally, he overcame her real will, and persuaded her to come down to a lawyer's office, where she parted with all her real and personal property of every kind for three thousand dollars. She went at his solicitation entirely. I do not believe that the woman was drunk when she went to the notary's office, and it may even be said that she knew generally of the nature of the transaction for which she was called there. But it is beyond dispute that she had been in a debauch for a month prior; that she was frightened, yet helplessly dependent upon defendant; that she hoped he did not mean a permanent separation, yet she feared that unless she executed the deeds he would take everything, and continue to maltreat her. The deeds were hastily read to her. She showed anxiety about the money, but took it, and acknowledged the conveyances. In this nervous condition, having been blindly deceived by the artifice of the defendant for ten long years preceding, when she executed the deeds and bills of sale in November, 1889, she simply yielded to this last bit of influence and advantage exercised over her, in the same way that she had sacrificed herself to every other wish of his throughout their whole cohabitation."

The opinion of the court below adverts to the fact that in the purchase of some of said real estate defendant executed his own notes for a portion of the purchase price, and thereafter paid said notes with plaintiff's money in his hands. There is no finding upon that point. If appellant had desired to have that point considered, he should have requested a finding thereon. However, it may be observed, in passing, that the opinion shows that plaintiff's money in fact paid said notes. If the mere fact that defendant gave his note or notes for a portion of the purchase price in said transaction, and afterwards paid said promises off with trust funds, would enable defendant to claim and hold an interest in said property, this would be a very convenient method for a fraudulently disposed trustee to pursue in putting trust funds into land, so as to hold an interest therein. If the point was squarely before us, we apprehend, from what is asserted as the facts in the opinion, and from the finding of the court, that plaintiff furnished the whole consideration for the purchase of said property, the point would be of no avail to appellant.

In defendant's answer he alleges that during all the period of his cohabitation with plaintiff he was a married man, and that plaintiff knew this. That allegation was not denied by replication. Upon this appellant's counsel argues that plaintiff had no reason to believe defendant intended to marry her. The court found from the evidence that defendant promised to marry plaintiff, and that plaintiff trusted his promise. The evidence is not here for review. Testimony may have been introduced, without objection, showing the facts as found by the court. It is not impossible that defendant, although married, may have promised to marry plaintiff, and succeeded in deluding her into the belief that he could so arrange his affairs as to carry out that promise. The court, no doubt, found as the evidence showed. Nevertheless, the fact that it was alleged in the answer that defendant was married during said time, and not denied, does not materially affect the equities of this case. That fact may have lessened the reason for plaintiff to have confided in defendant's promise. But there is ample showing that plaintiff trusted defendant, and he abused her confidence, and undertook to defraud her.

Appellant's counsel asserts in his brief "that whatever may have been the wrongs of the plaintiff, viewed from a stand-point of morality or of sympathy, she was not entitled to the relief demanded in her amended complaint, or to the decree rendered in her favor." The questions involved in this suit turn entirely upon the property rights of the parties and the validity of certain alleged conveyances. The court, we think, traced these out in a very lucid opinion, and based its conclusions on legal principles. Counsel apparently mistake the descriptive language necessary to be used by the judge in setting forth the relative condition and attitude of these parties towards one another and said property for the expression of sympathy or denunciation from a moral point of view. The court applied principles of law to acts and conditions shown, irrespective of their moral significance; the same result would follow as to any parties, irrespective of their moral virtues or delinquencies. From a moral stand-point, there may not be much room for comparison between the parties to this action. But if such comparison was necessary, we have no doubt, considering the condition and advantages of the respective parties, that the defendant would be awarded the superlative degree for depravity of conduct. The judgment, however, does not rest upon any such consideration; it is founded on the principles of law which forbid a person having in his possession the property of another to arbitrarily and without right assume ownership thereof, and then to profit by conveyances procured under circumstances of intimidation, duress, and oppression, whereby the wrong-doer attempts to perpetuate and legalize his usurpation. The judgment of the trial court will be affirmed with costs.

*Affirmed.*

Blake, C. J., and De Witt, J., concur.